# UNITED STATES DISTRICT COURT

### for the

### Eastern District of California

**FILED**

**Feb 24, 2025**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**SEALED**

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No.  2:25-mj-0043 JDP |
| | ) | |
| DOROTEO SUASTEGUI | ) | |
| | ) | |
| | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ March 12, 2024 _____ in the county of _____ Solano _____ in the
_____ Eastern _____ District of _____ California _____, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 922(a)(1)(A) | Unlawful dealing in firearms |

This criminal complaint is based on these facts:

(see attachment)

☒ Continued on the attached sheet and incorporated here by reference.

_____
/s/ Nathan Cernat
*Complainant's signature*

Nathan Cernat, FBI SA
*Printed name and title*

Sworn to me and signed via telephone.

Date: _____ February 24, 2025 _____

_____
*Judge's signature*

City and state: _____ Sacramento, California _____

Jeremy D. Peterson, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF APPLICATIONS UNDER RULE 41 FOR WARRANTS TO SEARCH AND SEIZE AND UNDER RULE 4 FOR A WARRANT TO ARREST**

## I.    INTRODUCTION

I, Nathan Cernat, being first duly sworn, hereby depose and state as follows:

1.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search DOROTEO SUASTEGUI (SUASTEGUI), his residence and his vehicles:

| Attachment | Target |
|---|---|
| A-1 | DOROTEO SUASTEGUI ("SUASTEGUI") |
| A-2 | 101 Hilborn Street, Apt. 9, Vallejo, CA ("SUASTEGUI'S RESIDENCE") |
| A-3 | A Blue Nissan, bearing the California License Plate 8HJZ932 ("SUASTEGUI'S VEHICLE 1") |
| A-4 | Green Chevrolet 1500, bearing the California License Plate 4U61896, ("SUASTEGUI'S VEHICLE 2") |

2.    The people and property to be searched are further described in Attachments A-1 through A-4.  The applications seeks to search them for the things described in Attachments B-1 through B-4. This affidavit also supports my application for an arrest warrant of SUASTEGUI.

## II.    AGENT BACKGROUND

3.    I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since April 2015.  As such, I am an "investigative or law enforcement officer" within the meaning of 18 U.S.C. § 2510(7), in that I am an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516.  I am currently assigned to the FBI's Sacramento Division, Vacaville Resident Agency, where I work as part of the FBI's Solano County Violent Crime Task Force.  In this role, I am responsible for investigating a variety of criminal matters, to include violations of the Firearms Act, illegal possession and distribution of controlled substances, and violent criminal enterprises such as street gangs and organized crime.

4.    I was trained as an FBI Special Agent at the FBI Academy in Quantico, Virginia.  During my training, I received training in Title 21 of the United States Code, including Sections 841(a)(1) and

846, conspiracy to distribute and possession with intent to distribute controlled and/or counterfeit substances, as well as 18 U.S.C. § 922(a)(1)(A), illegal firearms trafficking.  During my employment as an FBI Special Agent, I have participated in numerous criminal investigations involving the illegal trafficking of firearms and narcotics.  I have also participated in numerous investigations involving the use of federal and state search warrants to collect evidence, including firearms and controlled substances, the seizure of narcotics-related records, and other types of evidence that document the activities of criminal organizations in both the manufacturing and distribution of firearms and controlled substances.  To successfully conduct these investigations, I have utilized a variety of investigative techniques and resources including physical and electronic surveillance, various types of infiltration (including informants and cooperating sources), pen register and trap and trace devices, telephone tracking devices, mail covers, pole cameras, stationary video recording vehicles, wire intercepts, audio and audio/video recording devices.

5.      Through these investigations, my training and experience, and conversations with other agents and law enforcement personnel, I have become familiar with the methods used by organized criminal enterprises, drug trafficking organizations, and street gangs to smuggle and safeguard controlled substances and firearms, to distribute, manufacture, and transport controlled substances and firearms, and to collect and launder related proceeds.

6.      I am aware, from training and experience, that individuals engaged in firearms and drug trafficking commonly use coded language to refer to drugs and drug transactions.  Firearms and drug traffickers specifically use coded language in an effort to evade law enforcement by seemingly concealing the true nature of their discussions and actions.

7.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

8.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841 and 846, conspiracy to distribute and possess with intent to distribute controlled and/or counterfeit substances; 18 U.S.C. § 922(a)(1)(A),

illegal firearms trafficking; and 18 U.S.C. § 922(g)(5)(A), illegal alien in possession of firearms or ammunition, have been committed by SUASTEGUI. Collectively the violations described above will be referred to as the "TARGET OFENCES." There is also probable cause to search SUASTEGUI and property described in Attachments A-1 through A-4 for evidence and instrumentalities of these crimes further described in Attachments B-1 through B-4.

## II.     PROBABLE CAUSE

9.      The United States Government, and the FBI specifically, is investigating LEO ALONSO-MEDINA, CARLOS HIGUERA-ALDANA, JEREMIAH I'AMAFANA SALANOA, DOROTEO SUASTEGUI, DAVION MORGAN and other members of the Vallejo Subset Sureno street gang "Brown Brotherhood," commonly referred to as BBH, for suspected firearms and controlled substance trafficking in the Eastern District of California.

10.     There are at least two active Sureno gangs in the city of Vallejo. They are Brown Brotherhood (BBH) and Brown Crowd Locos (BCL). Many BBH and BCL members claim Westside Vallejo (WSV), meaning, they claim the west side of the city as their territory or area of operation. Whereas, a rival gang, Nortenos, claim East Side Vallejo (ESV) as their territory.

11.     BBH is one of the oldest and largest criminal street gangs within the city of Vallejo. BBH was first noticed by the Vallejo Police Department in 1991. BBH is comprised primarily of Hispanic males, although individuals of other races are accepted. BBH is a Sureno criminal street gang as they wear the color blue, utilize the number 13, and answer to the Mexican Mafia (La Eme). BBH has a "click," or group within the gang called West Side Pee Wees (WSP). This click was created to show respect to Israel Balderas (Rivera) (aka Pee Wee), a BBH gang member who was sentenced to prison for a gang related homicide in 2007. BBH members will get tattoos and tag their belongings and other property with things such as: SUR, 13, XIII, X3, 3 dots, South Sider, West Side Vallejo, WSV, West Side, WS, WSP, 228, and BBH. BBH gang members, BCL gang members, and other Surenos from the surrounding cities and counties have been seen cooperating and socializing together.

12.     Primary criminal activities of Sureno gang members have included murder, robbery, extortion, drug trafficking, firearms trafficking, burglary, stolen vehicles, and victim/witness intimidation. These criminal acts, in association with, or at the direction of older gang members (also

known as "OG's"), are meant to instill fear and intimidation in rival gang members, as well as members of the community who live and work in the neighborhoods controlled by the gang. Solano County law enforcement agencies, including the Vallejo Police Department and the Solano County Violent Crime Task Force (SCVCTF), have conducted numerous investigations surrounding BBH and BCL gang members. These investigations have led to arrests or convictions of various members for crimes including but not limited to drug sales, felony assaults, firearms trafficking, firearm possession and murder.

13.     SCVCTF is currently working with a Confidential Human Source (CHS).[1]  The CHS has provided information on various BBH gang members and has conducted multiple controlled firearm and/or drug purchases from various BBH members. This investigation began in February 2024 and has been ongoing since.

14.     On February 26, 2024, the CHS reported that SUASTEGUI, residing in Vallejo, CA, was a BBH gang member and was involved in the illegal distribution of firearms. The CHS reported that SUASTEGUI has recently posted a picture of him and one of his associates holding pistols on his Instagram account "dolorio77" (SUASTEGUI's Instagram). The CHS provided a screenshot of the picture posted by SUASTEGUI on the Instagram account "dolorio77."

---

[1]  The CHS started cooperating with the FBI in order to avoid prosecution from a state arrest. The CHS has since fulfilled his/her commitment to law enforcement and continued to cooperate with the FBI for monetary compensation. The CHS has requested the FBI's assistance with his/her immigration status in the US should it be needed in the future. However, no assistance with the CHS' immigration status has been provided to the CHS thus far. The CHS has no criminal convictions. The CHS has been arrested, but not convicted, for the following offenses: possession of a concealed firearm in a vehicle. The CHS has been an informant for the FBI since August 2022 and has been proven to be a reliable CHS thus far. The CHS' reporting has been proven to be truthful and has been independently verified by FBI agents.



*Figure 1: Screenshot of SUASTEGUI holding a firearm on his Instagram account.*

15. The CHS reported that SUASTEGUI had offered to sell the CHS firearms in the past. On February 27, 2024, I showed the CHS a Solano County booking photo of DOROTEO SUASTEGUI, DOB XX/XX/1977, without any identifying information. The CHS has positively identified SUASTEGUI based on the booking photo.

16. On March 9, 2024, the CHS contacted SUASTEGUI at telephone number 707-342- 0356 (SUASTEGUI's Cell Phone) and discussed a potential purchase for a firearm. SUASTEGUI indicated that he had firearms for sale and asked the CHS to stop by his residence. The CHS reported that SUASTEGUI resides at an apartment complex on Maher Court in Vallejo, CA. On March 11, 2024, the CHS called SUASTEGUI's Cell Phone to discuss the details of the firearm purchase. During their conversation, SUASTEGUI offered to sell the CHS a Ruger handgun for $1000 and a short barrel AR-15 style rifle for $1300.

**Controlled Buy of Two Firearms from SUASTEGUI on March 12, 2024**

17. On March 12, 2024, the CHS purchased two firearms from SUASTEGUI for $2400. This controlled buy was surveilled by undercover law enforcement, and the meeting between the CHS and SUASTEGUI was surreptitiously recorded. The CHS' vehicle and person were searched by law enforcement for contraband both before and after the controlled buy.

18. Prior to the controlled buy, the CHS called SUASTEGUI's Cell Phone and confirmed the transaction. SUASTEGUI instructed the CHS to meet him (SUASTEGUI) at his apartment located at

121 Maher Ct., Vallejo, CA. Surveillance units observed the CHS arriving in the parking lot of the apartment complex and meeting SUASTEGUI near a blue Nissan hatchback, bearing the California License Plate 8HJZ932 (SUASTEGUI'S VEHICLE 1). The video recording shows the CHS meeting with SUASTEGUI briefly and shaking hands. The CHS spoke with SUASTEGUI in Spanish during the entirety of the transaction. The video recording of their conversation was summarized into English by an FBI certified Language Specialist, who confirmed the CHS' account of their conversation.

19. Per CHS reporting, SUASTEGUI stated he had two AR-15 style firearms for sale. FBI surveillance units observed SUASTEGUI walking into his residence at 121 Maher Court shortly after meeting with the CHS. FBI surveillance units observed SUASTEGUI exiting the apartment with a blue child's backpack with cartoon images on it and walking back towards the rear of SUASTEGUI'S VEHICLE 1. The video recording shows SUASTEGUI arriving near SUASTEGUI'S VEHICLE 1 with the blue backpack in his hand. The video recording shows the CHS walking towards the rear of SUASTEGUI'S VEHICLE 1. The vehicle's rear hatch was opened and the blue backpack was on the floorboard of the vehicle. The video recording captured a black AR-15 style pistol that was placed on top of the blue backpack. The video recording shows SUASTEGUI handling the AR-15 style pistol and showing it to the CHS. The CHS reported that SUASTEGUI advised that he had another AR-15 with blue accessories and parts on it that was for sale. Per CHS reporting, SUASTEGUI had trouble getting the blue AR-15 to work but showed the CHS a cell phone video of him test firing the AR-15. SUASTEGUI told the CHS that the AR-15 pistol would cost $1300.

20. The CHS reported that SUASTEGUI went to the rear passenger door of SUASTEGUI'S VEHICLE 1 and retrieved a .45 ACP 1911 handgun from inside the vehicle. The video recording captures SUASTEGUI showing the CHS a black handgun with brown accent on the grips. SUASTEGUI told the CHS that the price for the 1911 pistol was $1100.

21. The CHS reported that SUASTEGUI showed the CHS a 1911 style .22 handgun as well. The handgun had images of "St. Jude" on the grips with gold accents. The video recording shows SUASTEGUI removing the magazine from a black pistol with gold accents on the grips and showing it to the CHS.

22. The CHS purchased the .45 ACP 1911 and the AR-15 pistol from SUASTEGUI for

$2400.  The video recording shows the CHS handing SUASTEGUI the money and SUASTEGUI counting the cash.

23.    After the transaction, an unknown Hispanic Male Adult (HMA) arrived in a silver Nissan Sentra bearing the California License Plate 9ENF024.  The video recording shows the HMA arriving and greeting the CHS.  SUASTEGUI told the CHS that the HMA was his brother.  The CHS reported that SUASTEGUI's brother removed a loaded Ruger handgun from his waistband and showed it to the CHS.  The video recording shows SUASTEGUI removing a loaded magazine from a black handgun and handing the handgun to the CHS.  The CHS attempted to purchase the Ruger, the 1911 and AR-15 for $3000, but SUASTEGUI and his brother did not agree to the price.  SUASTEGUI's brother showed the CHS an image of a shotgun on his phone as the CHS was about to leave.  SUASTEGUI's brother advised the CHS could purchase the shotgun for $750.

24.    The CHS left the meeting location under constant surveillance.  The CHS met with agents after the controlled buy operation at a predetermined location and turned over the firearms purchased from SUASTEGUI.  Agents took custody of the firearms evidence: a Norinco 1911A1 handgun with serial number 418735 and a privately manufactured AR style pistol with a short barrel and a front grip.  The magazine of the handgun was loaded with seven rounds of Winchester .45 caliber ammunition.  The AR style pistol had a high-capacity magazine with no ammunition in it.



*Figure 2: Firearms purchased from SUASTEGUI on March 12, 2024.*

25.     On March 18, 2024, U.S.C.I.S. Agent Ohnemus provided the FBI a summary of SUASTEGUI's immigration records which revealed that SUASTEGUI is a Mexican national and does not have the proper immigration status to remain in the United States legally.  In addition, the immigration records revealed that SUASTEGUI has been previously apprehended by Border Patrol Agents trying to enter the United States without proper immigration documents and was deported back to Mexico on January 13, 2004.

26.     I subsequently reviewed SUASTEGUI's criminal history which revealed that SUASTEGUI had two active warrants pursuant to two criminal cases in Vallejo, CA.  The SCVCTF requested that Vallejo Police Department (VPD) provide copies of the police reports associated to SUASTEGUI.  The following is a brief summary of three VPD cases:

27.     VPD case #11-8717: On July 28, 2011, VPD Officers responded to 140 Buss St, Vallejo, CA, in reference to reports of firearm shots in the area.  Officers arrived on scene and throughout the investigation determined that a Hispanic male adult—who was later identified as SUASTEGUI—was intoxicated and had been seen firing a handgun.  SUASTEGUI was contacted at 140 Buss St., and a .22 caliber firearm was seen in plain view along with lose .22 caliber ammunition.  SUASTEGUI was detained on scene.  While speaking with victims and witnesses on scene it was discovered that SUASTEGUI had been intoxicated and was firing the gun into the air.  A neighbor asked SUASTEGUI to stop or she would call the police.  SUASTEGUI approached the victim's residence at 144 Buss St. and kicked the door causing damage.  Bullet holes were later observed in the exterior of 144 Buss St.  SUASTEGUI was arrested and booked into the Solano County jail.  It should be noted that as of January 15, 2025, SUASTEGUI had an active $25,000 bench warrant related to this investigation.

28.     VPD case #12-2380: On February 21, 2012, VPD officers responded to "Cha Am" which is a restaurant located at 157 Plaza Dr. Vallejo, CA, in reference to a shooting that had occurred. Through the investigation, law enforcement learned that SUASTEGUI arrived at the restaurant and confronted Jose Angel Suastegui and Miguel Suastegui-Hernandez.  The confrontation was due to a previous family disagreement.  On the day of the shooting, SUASTEGUI arrived at 157 Plaza Dr. and called Jose out of the restaurant.  SUASTEGUI fought Miguel and Jose.  SUASTEGUI left and soon returned and fired a gun from his vehicle hitting Miguel once in the right thigh as Jose was standing

behind him.  SUASTEGUI fled the scene.  Witnesses in a nearby business corroborated the victim's statements.  One of the victims told VPD officers that SUASTEGUI associated with Sureno gang members and has problems with Nortenos.  The victims in this case advised they were not Nortenos and the incident appeared to be a family dispute.  It should be noted that as of January 15, 2025, SUASTEGUI had an active $225,000 bench warrant related to this investigation.

29.  VPD case #22-4008: On April 16, 2022, BBH gang member Arturo Vasquez-Dominguez, aka "Tito," was murdered in the parking area of 121 Maher Ct. Vallejo, CA, which at that time was SUASTEGUI's place of residence.  On the date of the incident, a large gathering took place in the parking lot where Vasquez-Dominguez was murdered.  A 2000 Ford Ranger, bearing the California License Plate 7E00542 was observed on scene and lying in plain view inside the vehicle was an empty leather firearm holster and a Glock magazine.  The vehicle was parked in the stall belonging to 121 Maher Ct. and the keys were still in the ignition.  SUASTEGUI was not located on scene.  Witnesses at 121 Maher Ct. advised that SUASTEGUI comes and goes as he pleases but he was seen at the residence on the day of the incident.  The Ranger was towed as evidence relating to the homicide investigation.  A search warrant was executed on the Ranger and the following items were located and seized from inside the vehicle: two empty firearm magazines; miscellaneous ammunition located in the center console, glove box, passenger door pocket and throughout the vehicle; holster located on the passenger floorboard; crystal like substance in a bag on the floorboard; scale on the driver floorboard; a "Bryco" .38 caliber firearm under the driver seat with a partially scratched off serial number; a card with the name "DOROTEO SUASTEGUI CARBAJAL;" a small bag with white powder in the glove box; and miscellaneous gun parts in the glove box and center console.  The overall investigation is suspected to be a gang related homicide.  No arrests have yet to be made and the case is still under investigation.

30.  On April 2, 2024, this Court authorized a Search Warrant for SUASTEGUI's Instagram account.  On April 17, 2024, Meta Platforms Inc. provided records associated with SUASTEGUI's Instagram account. A review of the records provided by Meta Platforms Inc. revealed that at the time the search warrant was served, SUASTEGUI's Instagram account profile picture was a photograph of SUASTEGUI holding a beer bottle in his hand and a firearm is visible in his waistband.



*Figure 3: SUASTEGUI's Instagram profile picture.*

31.    The review of the records provided by the Meta Platforms for SUASTEGUI's Instagram account also revealed several videos confirming that SUASTEGUI is a BBH gang member.  The videos were posted by SUASTEGUI as Instagram stories and capture SUASTEGUI at the graveside of Antonio Navarrete with other known BBH gang members such as Jose Anguiano, Carlos Higuera-Aldana, Ricardo Esquibel, Davion Morgan and Jeremiah Salanoa.  Navarette was a known BBH gang member in the city of Vallejo who was murdered in a gang shooting in 2016 by a Norteno gang member.

1
2
3
4
5
6
7
8
9
10
11
12



*Figure 4: SUASTEGUI at the graveside of former known BBH gang member Antonio Navarrete.*

13      32.     On April 9, 2024, at the direction of the handling agents, the CHS called SUASTEGUI's

14   Cell Phone to inquire about the status of the two firearms SUASTEGUI and his brother had offered to

15   sell the CHS.  SUASTEGUI told the CHS that one of the firearms had already been sold while one was

16   still available.  SUASTEGUI did not tell the CHS which firearm was still available but told the CHS that

17   there will always be more firearms that the CHS could purchase.  The CHS inquired if SUASTEGUI

18   could connect the CHS with a narcotics supplier.  SUASTEGUI offered to sell the CHS cocaine for

19   $1000 per ounce.  The CHS told SUASTEGUI that s/he would have to call him back regarding the

20   purchase of more firearms or cocaine.

21      33.     On April 29, 2024, at the direction of the handling agents, the CHS called

22   SUASTEGUI's Cell Phone and inquired about a 9mm Ruger pistol that SUASTEGUI had offered to sell

23   the CHS in the past.  SUASTEGUI told the CHS that he had already sold the 9mm Ruger pistol but

24   offered to sell the CHS a .45 caliber Ruger for $1300.  SUASTEGUI told the CHS that one of his

25   associates had a "Draco" for sale and that he would inquire if the Draco was still available and how

26   much it would cost.  SUASTEGUI told the CHS that his supplier would be able to provide an "Uzi" for

27   the CHS.  Based on my training and experience, I know that an "Uzi" is an Israeli submachine gun.

28

34.     On April 30, 2024, the CHS contacted SUASTEGUI to check on the status of the Draco. SUASTEGUI informed the CHS that his associate had already sold the Draco.  SUASTEGUI told the CHS that he was still inquiring about an Uzi with one of his associates and would later let the CHS know if the Uzi was available and at what price.  In that conversation, SUASTEGUI offered to sell the CHS a short barrel AR-15 riffle for $1300.

### Controlled purchase of two firearms from SUASTEGUI on May 1, 2024

35.     On May 1, 2024, the CHS conducted a controlled purchase of two firearms from SUASTEGUI.  This controlled buy was surveilled by undercover law enforcement and the meeting between the CHS and SUASTEGUI was surreptitiously recorded.  The CHS' vehicle and person were searched by law enforcement for contraband both before and after the controlled buy.

36.     Prior to the controlled buy, at the direction of the handling agents, the CHS called SUASTEGUI to check on the status of the previously discussed Uzi.  SUASTEGUI told the CHS that the Uzi was not available but told the CHS that the previously discussed Ruger .45 and short barrel AR-15 style rifle were still available if the CHS wanted to purchase the firearms.  The CHS agreed to purchase the two firearms and set up the meeting to take place at SUASTEGUI's residence located at 121 Maher Court, Vallejo, CA.

37.     The CHS reported that when s/he arrived in the parking lot of the Maher Court apartments, SUASTEGUI was already waiting for the CHS near SUASTEGUI'S VEHICLE 1.  The video recording shows SUASTEGUI standing near the vehicle and the rear hatch door of the vehicle was opened.  The CHS spoke with SUASTEGUI in Spanish during the entirety of the transaction.  The video recording of their conversation was summarized into English by an FBI certified Language Specialist, who confirmed the CHS' account of their conversation.  The CHS reported that the two firearms were located inside the trunk compartment of the vehicle.  The .45 Ruger with gold grips was laying on the floorboard of the vehicle with a magazine inserted in the magazine well of the firearm. SUASTEGUI retrieved the pistol from the floorboard of the vehicle and removed the magazine. SUASTEGUI functioned the slide of the pistol and showed the firearm to the CHS.  The video recording shows SUASTEGUI reaching inside the trunk area of the vehicle to retrieve something.  Several

1   moments later the video shows the CHS handling what appeared to be a handgun.  The video shows a

2   handgun magazine on the floorboard of the trunk.

3       38.    The CHS reported the AR-15 rifle was disassembled in a child's blue backpack with

4   cartoon characters on it.  The backpack was placed on the floorboard of the vehicle, which is confirmed

5   by the video recording.  SUASTEGUI had two barrels available for the AR-15 rifle: a shorter barrel with

6   blue handguard and a longer barrel with black handguard.  SUASTEGUI told the CHS that s/he could

7   choose between the two barrels.  The video recording captured SUASTEGUI assembling an AR-15 rifle

8   with a blue handguard and introducing a high-capacity magazine inside the magazine well of the

9   firearm.  The video recording shows SUASTEGUI placing the firearm on the floorboard of the vehicle

10  and the CHS retrieving and inspecting the firearm.  The CHS reported that SUASTEGUI provided the

11  high-capacity magazine with the AR-15 rifle.  The video recording captures SUASTEGUI showing the

12  CHS what appears to be a different AR-15 barrel with a black handguard.  The CHS inspected the AR-

13  15 rifle and disassembled it before placing it in his/her backpack.

14      39.    The video recording shows the CHS handing SUASTEGUI cash and SUASTEGUI could

15  be seen counting the cash.  The CHS paid SUASTEGUI $1300 for the handgun and $1300 for the AR-

16  15.  Per CHS reporting, SUASTEGUI offered to sell the CHS ammunition for the AR-15.  SUASTEGUI

17  showed the CHS a black ammunition box and told the CHS it contained 150 rounds.  SUASTEGUI told

18  the CHS that the price of the ammunition was one dollar each, but he (SUASTEGUI) would sell it to the

19  CHS for $100.  The CHS paid SUASTEGUI $100 for a box of ammunition.  SUASTEGUI told the CHS

20  that his firearms supplier is the son of one of his coworkers.  SUASTEGUI told the CHS that he would

21  call his supplier at around 5:30 p.m. that day to see what firearms were available.  SUASTEGUI told the

22  CHS that he would let CHS know when an Uzi or a Draco were available for purchase.

23      40.    The CHS left the meeting location under constant surveillance.  The CHS met with

24  agents after the controlled buy operation and turned over the firearms purchased from SUASTEGUI.

25  Agents took custody of the firearms evidence: an American Tactical 1911A1 handgun with serial

26  number ML138099 and a privately manufactured AR style rifle with a short barrel and a plastic box

27  containing 132 rounds of Winchester .223 caliber ammunition.  The magazine of the handgun was

28  loaded with five rounds of various makes of .45 caliber ammunition.



*Figure 5: Firearms purchased from SUASTEGUI on May 1, 2024.*

41.     Later the same day, SUASTEGUI texted the CHS from SUASTEGUI's Cell Phone and told the CHS that he found a Draco for $3500.  The CHS requested SUASTEGUI to provide a picture of the firearm.  SUASTEGUI told the CHS that he would provide a picture of the firearm at a later time.

42.     On May 4, 2024, SUASTEGUI contacted the CHS via text messages and offered to sell the CHS two privately manufactured Glock pistols.  SUASTEGUI sent the CHS a picture of the two firearms and told the CHS the price for one firearm was $1200, while the price for the other firearm was $800.  The CHS confirmed receipt of the picture and told SUASTEGUI s/he would let SUASTEGUI know if CHS was interested to purchase the firearms.

**_Controlled purchase of two firearms and four ounces of methamphetamine from SUASTEGUI on January 8, 2025_**

43.     On January 6, 2025, at the direction of the handling agents, the CHS contacted SUASTEGUI via text messages at SUASTEGUI's Cell Phone and inquired if SUASTEGUI had any firearms for sale.  SUASTEGUI responded that he had only a short "R."  The CHS asked SUASTEGUI to provide a price and SUASTEGUI replied "13."  The CHS explained that SUASTEGUI was offering to sell the CHS a short barrel AR style rifle for $1300.  The CHS asked SUASTEGUI to provide a picture of the firearm and SUASTEGUI replied that he did not have a picture at the time but would take

a picture of the firearm when he got home.  Later the same day, SUASTEGUI texted the CHS that he had a 357 Magnum that he was selling for $850.  SUASTEGUI told the CHS the 357 Magnum was new and that he tested it out at New Years.  The CHS asked SUASTEGUI to provide pictures of the two firearms.

44.    On January 8, 2025, SUASTEGUI sent the CHS a picture of the previously discussed short barrel AR style rifle and revolver via text messages from SUASTEGUI's Cell Phone.  I subsequently reviewed the picture sent by SUASTEGUI and the firearms appeared to be in the trunk area of a blue vehicle when the picture was taken.  The CHS asked SUASTEGUI if they could meet for the transaction later that day at SUASTEGUI's residence.  SUASTEGUI confirmed that he was available to meet the CHS at his residence later that day and told the CHS that he (SUASTEGUI ) moved to 101 Hilborn Ave, Vallejo, CA.

45.    Later the same day, the FBI conducted an updated DMV records check on SUASTEGUI'S VEHICLE 1, which revealed the vehicle was registered to Antonia Alcaide at 101 Hilborn Street, Apartment 9, Vallejo, CA 94590 (SUASTEGUI'S RESIDENCE). Based on my training and experience, I know that individuals who are involved in the illegal trafficking of firearms and narcotics are often registering their vehicles in the name of their family members in efforts to evade law enforcement.

46.    On January 8, 2025, the CHS met SUASTEGUI at SUASTEGUI'S RESIDENCE and purchased two firearms and approximately 120 grams of methamphetamine from SUASTEGUI for $3000.  This controlled buy was surveilled by undercover law enforcement and the meeting between the CHS and SUASTEGUI was surreptitiously recorded.  The CHS' vehicle and person were searched by law enforcement for contraband both before and after the controlled buy.

47.    Prior to their meeting, handling agents tasked the CHS to call SUASTEGUI and inquire if he (SUASTEGUI) had any methamphetamine readily available for sale.  The CHS called SUASTEGUI's Cell Phone with handling agents present and inquired if SUASTEGUI had any methamphetamine readily available.  The CHS reported that during their phone conversation, SUASTEGUI told the CHS he had methamphetamine available at the price of $200 per ounce.  The CHS agreed to the price and told SUASTEGUI s/he would like to purchase four ounces of

methamphetamine during their meeting.

48.     Law enforcement established surveillance in the vicinity of SUASTEGUI'S RESIDENCE prior to the meeting between SUASTEGUI and the CHS.  Surveillance units observed SUASTEGUI arriving in a green Chevrolet 1500, bearing the California License Plate 4U61896 (SUASTEGUI'S VEHICLE 2) and parking in the parking lot of the apartment complex.  Surveillance units observed SUASTEGUI walking towards the apartment building prior to the arrival of the CHS.

49.     The CHS reported s/he arrived in the parking lot of SUASTEGUI'S RESIDENCE and parked next to a gray minivan and SUASTEGUI'S VEHICLE 1, which were parked under the carport. The CHS called SUASTEGUI's Cell Phone and told him s/he arrived.  The CHS reported that SUASTEGUI instructed the CHS to wait right there because those were his cars.  Surveillance units observed SUASTEGUI walking from the direction of the apartment building and meeting the CHS near SUASTEGUI'S VEHICLE 1.  The CHS reported that SUASTEGUI came from the direction of the apartments building with a gray beanie in his hand.  The video recording captures SUASTEGUI opening the rear hatch of SUASTEGUI'S VEHICLE 1.  The CHS reported that a short barrel AR style rifle was in the trunk area of the vehicle.  The CHS reported SUASTEGUI picked up the firearm, removed a black magazine, racked the firearm and handed it to the CHS to check it.  The CHS reported that SUASTEGUI told the CHS he had two magazines for the firearm.  One magazine would come with the firearm while the second one would cost the CHS an additional $40 if the CHS wanted it.  The CHS agreed to purchase the second magazine.  The CHS reported the black magazine had rounds in it and SUASTEGUI removed all rounds before giving it to the CHS.  SUASTEGUI told the CHS that he test-fired the AR rifle and it was functional.  The CHS wrapped the AR style rifle and the magazines in a parka vest that s/he brought to the meeting to conceal the firearms.

50.     Per CHS reporting, SUASTEGUI told the CHS he had to go get the 357 Magnum revolver and walked to a green truck parked in the lot facing SUASTEGUI'S VEHICLE 1 to retrieve the revolver.  Surveillance units observed SUASTEGUI walk to SUASTEGUI'S VEHICLE 2 during his meeting with the CHS and returned back to SUASTEGUI'S VEHICLE 1 with a satchel.  The video recording shows SUASTEGUI placing what appeared to be a tan satchel in the trunk of SUASTEGUI'S VEHICLE 1 and removing a revolver from inside the satchel.  The CHS reported that SUASTEGUI

opened the revolver up and took all rounds out before handing it over to the CHS.  The CHS reported that SUASTEGUI stated he shot approximately 50 rounds of both .38 and 357 ammunition during the New Year celebration and the revolver functioned well.  The CHS placed the revolver in the vest with the AR rifle.

51.     The CHS reported that SUASTEGUI retrieved four clear plastic bags containing methamphetamine from the gray beanie SUASTEGUI was holding in his hand when he initially met the CHS.  SUASTEGUI gave the narcotics to the CHS.  SUASTEGUI told the CHS it was four ounces, and the price was $200 per ounce.  The video recording shows SUASTEGUI retrieving what appeared to be a clear plastic bag containing clear/white substance from inside a beanie which was in the trunk area of SUASTEGUI'S VEHICLE 2.  The CHS reported s/he counted $3000 and gave it to SUASTEGUI one thousand at a time.  In the video recording the two could be heard counting money.  The CHS reported SUASTEGUI used a phone calculator to figure out how much the CHS owed him for the firearms and methamphetamine.  SUASTEGUI showed the CHS that the amount owed was $2950.  This moment was captured by the video recording.  The CHS believed that SUASTEGUI forgot to include the second magazine that he gave the CHS, which would add $40 to his total.  The CHS asked SUASTEGUI if he had any change and SUASTEGUI replied he did not have change.  The CHS told SUASTEGUI that he would owe the CHS $50 on the next transaction and SUASTEGUI agreed.

52.     The CHS reported that SUASTEGUI offered to supply the CHS with "soda" for $1000 per ounce or anything else the CHS wanted.  Based on my training and experience, I am aware that "soda" is a slang term used for Cocaine.  SUASTEGUI also told the CHS he had a supplier that could provide Glock handguns in their original boxes at a price of $1300 to $1400 each.

53.     SUASTEGUI told the CHS that he had an opportunity to supply the CHS with a Draco, but decided against contacting the CHS regarding that particular Draco because "it had a body on it." The CHS understood that statement to mean that someone was murdered with that firearm. SUASTEGUI showed the CHS a picture of the firearm on his phone and stated he had the firearm under the same carport approximately 15 days ago.  The CHS reported that s/he was able to recognize the carport of SUASTEGUI'S RESIDENCE in the picture of Draco SUASTEGUI was showing the CHS. SUASTEGUI told the CHS the supplier for the Draco wanted $3000 but he (SUASTEGUI) did not want

to pay so much for a firearm that "had a body on it."  SUASTEGUI told the CHS he offered to pay $2000 for the Draco but the seller did not agree to the price.

54.     During this meeting SUASTEGUI told the CHS that he moved from the Maher Ct. apartments because he observed some cameras being installed at the apartment complex.  SUASTEGUI told the CHS that he also received a text in English from an unknown number asking if he was still selling firearms, which he thought was very suspicious because he (SUASTEGUI) only sells firearms to people he knows.

55.     After the transaction was complete, the CHS departed SUASTEGUI'S RESIDENCE under constant surveillance.  The CHS met with handling agents and turned over the firearms and drugs evidence purchased from SUASTEGUI: a short barrel AR style rifle with serial number 8789305 with two high-capacity magazines; a Smith & Wesson 357 Magnum revolver with serial number 69K6993; and four clear plastic bags containing clear crystal-like substance, suspected to be methamphetamine. The suspected methamphetamine weighed approximately 120 grams in its original packaging.  Although this suspected methamphetamine has not yet been tested by a laboratory, agents have subsequently visually inspected the suspected narcotics and concluded that the crystal-like substance sold by SUASTEGUI to the CHS as methamphetamine was consistent with the shape and color of actual methamphetamine.



*Figure 6: Firearms and narcotics purchased from SUASTEGUI on March 12, 2024.*

56.     On January 29, 2025, Pacific Gas and Electric Company (PG&E) responded to an FBI administrative subpoena and provided subscriber information for services provided at SUASTEGUI'S RESIDENCE.  The records provided by PG&E show that the subscriber for electricity and natural gas at SUASTEGUI'S RESIDENCE was Antonia Alcaide Cortez.  It is worth noting that California DMV records revealed the registered owner for SUASTEGUI'S VEHICLE 1 is that same individual.  Based on my training and experience, I know that individuals who are involved in the illegal trafficking of firearms and narcotics often register their vehicles, phone, or utilities services in the name of their family members or others in efforts to evade law enforcement.

### *Training and Experience Regarding Drug/Firearm Trafficking and Drug/Firearms Traffickers*

57.     As a result of my training and experience, I know that the traffickers who deal in controlled substances and firearms, or those that assist in that venture, maintain and tend to retain accounts or records of those transactions.  Such records detail amounts outstanding, owed, or expended, along with records tending to indicate the identity of the co-conspirators.  These records may be kept on paper or contained in memory calculators or computers.  It is also my experience that these traffickers tend to keep these accounts and records in their residences and in the areas under their control.  It is my training and experience that in the case of drug dealers, evidence is likely to be found where the dealers live.  It is also my training and experience that where criminal activity is long term or on-going, equipment or records of the crime will be kept for some period of time.

58.     I have learned that large-scale drug and firearms traffickers often have on hand large amounts of United States currency in order to maintain and finance their ongoing business.  It has been my experience that drug traffickers often keep large sums of currency, caches of drugs, financial instruments, precious metals, jewelry, automobiles, and other items of value and/or proceeds of drug transactions related to obtaining, transferring, secreting or spending large sums of money acquired from engaging in in the acquisition and distribution of controlled substances in their residence or in the areas under their control.

59.     In my experience, drug traffickers commonly have in their possession, that is on their person, at their residence, in their vehicles, and in the areas under their control, firearms, included but

not limited to handguns, pistols, revolvers, shotguns, rifles, machine guns, and other weapons. Such firearms are used by criminals to protect their illicit trafficking operations, and themselves against law enforcement and others because the illicit drug and firearms trade is an inherently dangerous illegal activity involving large amounts of valuable contraband and drug proceeds.

60.    In my experience, traffickers commonly have in their possession, that is on their person, at their residence, in their vehicles, and in the areas under their control and which they have free and ready access to drugs and firearms, which they intend to distribute. It is my experience that these traffickers commonly utilize these areas (vehicles, residences, properties, etc.) as locations to conceal their narcotics from law enforcement.

61.    In my experience, traffickers may take or cause to be taken, photographs or videotapes of themselves, their associates, their property, and their product. Such traffickers often maintain photographs and/or videotapes at their residence or in the areas under their control.

62.    In my experience, large scale traffickers often maintain in their possession and at their residence fictitious identification, including but not limited to, driver licenses, employment cards, insurance cards, social security cards, certificates of birth and passports which are obtained by the traffickers and utilized in an effort to prevent law enforcement identification of the traffickers and their drug trafficking activities.

63.    In my experience, drug traffickers often utilize vehicles in which to transport and distribute controlled substances in facilitation of their trafficking activities. It has also been my experience that traffickers will also utilize the vehicles as locations in which to store controlled substances and guns prior to distribution. During prior investigations, I have observed that traffickers will often utilize vehicles registered in the names of individuals other than themselves in an effort to avoid detection by law enforcement.

64.    In addition, drug and gun traffickers often tend to attempt to legitimize their assets by establishing domestic and foreign businesses, by creating shell corporations, by utilizing foreign bank haven countries and attorneys specializing in drafting and establishing such entities employed to "launder" proceeds derived from the distribution of controlled substances.

65.    Individuals involved in the distribution of guns and drugs often make, or cause to be

1 made, pictures videos, movies, compact discs, or other such items which are or contain photographic or

2 digital images in order to memorialize their narcotics distribution, use, possession, or any other activities

3 surrounding their trafficking activities, and that such items often identify co-conspirators in their

4 trafficking activities.

5     66.     It has been my experience in the past, and particularly in this case, that when suspects use

6 mobile phones to communicate with cooperating individuals or undercover agents to set up their illegal

7 transactions, records relating to these activities will be found stored in the cellular telephone.

8     67.     I know that traffickers use mobile phones to communicate with one another, either by

9 voice or text message.  Mobile phones preserve in their memory a history of incoming, outgoing, and

10 missed calls, which can lead to evidence of the phone numbers of other traffickers and the dates and

11 times that they and/or the mobile phone user dialed one another's telephones.  Mobile phones also

12 contain in their memory a telephone book.  This allows the user to store telephone numbers and other

13 contact information; the information stored in a phone used by a trafficker is evidence of the association

14 of the trafficker, some of which is related to his or her illegal business.  Mobile phones also have a voice

15 mail function that allows caller to leave a message when the user does not answer.  Traffickers

16 sometimes leave voice messages for each other, and this is evidence both of their mutual association and

17 possibly their joint criminal activity.  Mobile phones can also contain other user-entered data files such

18 as to-do lists, which can provide evidence of crime when used by a trafficker.  Mobile phones can also

19 contain photographic data files, which can be evidence of criminal activity when the user was a

20 trafficker who took pictures of evidence of crime.

21     68.     As described in the Attachments A-1 through A-4, this affidavit seeks permission to

22 search and seize things that are related to the drug/firearms-trafficking activities between SUASTEGUI

23 and his co-conspirators and accomplices, in whatever form such things are stored.  Based on my training

24 and experience, I know that electronic devices can store information for long periods of time.  Even

25 when a user deletes information from a device, it can sometimes be recovered with forensic tools.

26 Similarly, things that have been viewed via the Internet, are typically stored for some period of time on

27 the device.  This information can sometimes be recovered with forensic tools.

28     69.     It is my opinion, based on my training and experience, and the training and experience of

other law enforcement investigators to whom I have spoken to, that the items listed in the respective Attachment B are items most often associated with the distribution of controlled substances as well as the proceeds from such illegal operations.

70.     Individuals involved in drug and gun trafficking also often maintain paraphernalia for packaging, weighing, cutting, testing, distributing, and identifying controlled substances.  Therefore, I am requesting authority to seize all items listed in Attachment B to this affidavit and incorporated here by reference.

## CONCLUSION

71.     I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in each respective Attachment A and seize the items described in each respective Attachment B.

## REQUEST FOR SEALING

72.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time.  Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

/s/ Nathan Cernat
Nathan Cernat
Special Agent
FBI

Subscribed and sworn to me via telephone on:    February 24, 2025

The Honorable Jeremy D. Peterson
UNITED STATES MAGISTRATE JUDGE

*/s/ R. Alex Cardenas*

Approved as to form by AUSA R. ALEX CARDENAS